IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| GOVERNMENT EMPLOYEES | ) | |
| MEDICAL PLAN, a/k/a GEMPLAN, an | ) | Case No. CV-04-284-E-BLW |
| Idaho Legal Entity; BOARD OF | ) | |
| TRUSTEES OF GEMPLAN, in their | ) | **MEMORANDUM** |
| Capacity as Trustees of the Trust Fund of | ) | **DECISION** |
| GEMPLAN'S Self-funded Health Care | ) | |
| Plan; and MUTUAL INSURANCE | ) | |
| ASSOCIATES, INC., an Idaho Corporation,) | | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| REGENCE BLUE SHIELD OF IDAHO, | ) | |
| INC., an Idaho Corporation; and BLUE | ) | |
| CROSS OF IDAHO HEALTH SERVICES, ) | | |
| INC., an Idaho Corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ __) | | |

## INTRODUCTION

The Court has before it numerous motions by the parties to this antitrust

case.  Concerning two motions to exclude the testimony of experts, the Court heard

testimony from the two experts defendants seek to exclude as witnesses.

In an earlier-field decision, the Court found that all claims were subject to

dismissal, but reserved ruling on the price-fixing claims, seeking more time to

**Memorandum Decision – Page 1**

consider those claims.  For the reasons expressed below, the Court now finds that the price-fixing claims must be dismissed, along with the entire case.

## ANALYSIS

The Court set forth the factual background of this case in detail in an earlier-filed decision, and will only briefly summarize that discussion here.  This is an antitrust action.  Plaintiff Gemplan claims that defendants Regence and Blue Cross conspired to bar it from competing with them to provide Idaho counties with health insurance.  Gemplan also alleges that after it did enter that market, Regence and Blue Cross conspired to drive it out.

The alleged method used by Regence and Blue Cross to drive Gemplan from the market was to terminate their agency relationship with Gemplan's General Manager, plaintiff Mutual Insurance Agency (MIA), in an effort to force MIA out of business, which would compel MIA to withdraw as Gemplan's General Manager, thereby destroying or crippling Gemplan.  MIA seeks to restrain the terminations, and the Court has granted its request as a preliminary matter until the action is resolved.

In earlier-filed decisions, the Court found that the claims of Gemplan and MIA were subject to dismissal on summary judgment.  However, the Court also allowed plaintiffs to amend their complaint to add a claim for price-fixing, and

**Memorandum Decision – Page 2**

granted plaintiffs' motion to allow further discovery on that claim.

The Court set up a schedule that, among other things, required (1) that plaintiffs file their Rule 26 expert reports on February 28, 2005, (2) that defendants file their expert reports on March 31, 2005, (3) that any rebuttal expert reports be filed on April 30, 2005, and (4) that all expert discovery be completed by May 31, 2005.  In a decision filed a few months later, the Court affirmed its earlier conclusion that plaintiffs' original claims should be dismissed, and stated that,

> all of [plaintiffs'] claims now hang entirely on the survival of the price-fixing claims.  If the Court eventually finds that summary judgment is proper on the price-fixing claims, final judgment shall then be issued on all claims for Regence and Blue Shield.  If, however, the price-fixing claims survive summary judgment, that would have an effect on the other claims in the case.  As the Court explained in its prior decision, evidence that Regence and Blue Cross engaged in concerted price-fixing before Gemplan entered the market is at least some evidence that Regence and Blue Cross may have engaged in concerted action after Gemplan's entry.  Thus, MIA's case now depends entirely on how the Court resolves the price-fixing claims.

The parties have now completed their discovery and the defendants have filed motions for summary judgment on the price-fixing claims.  The Court will review those claims after first resolving disputes over the testimony of Gemplan's experts.

## 1. <u>Disputes Over Expert Testimony</u>

Regence and Blue Cross seek to exclude any testimony from two experts

hired by Gemplan: (1) Dr. James Langenfeld, and (2) William T. O'Brien. Each expert has rendered an opinion important to the price-fixing analysis that is being challenged by Regence and Blue Cross: (1) Dr. Langenfeld testified that the incumbency rate – that is, the percentage of customers who stayed with the same carrier (either Regence or Blue Cross) between 2000 and 2004 – was high, indicating a lack of vigorous competition; and (2) O'Brien testified that the premiums charged by Regence and Blue Cross during those years were 5% to 20% higher than what would be expected in a market where premiums are set based upon competitive pressures.

The Court will turn first to the motion to exclude Dr. Langenfeld's testimony, and then resolve the motion to exclude O'Brien's testimony.

## 2.   <u>Motion To Exclude Dr. Langenfeld's Expert Opinion</u>

Dr. Langenfeld testified that Regence and Blue Cross experienced "high incumbency rates" between 2000 and 2004 that were "consistent with less vigorous competition in the county market prior to 2004 than after the entry of Gemplan." *See Dr. Langenfeld's Supplemental Affidavit* at p. 3. By "high incumbency rates," Dr. Langenfeld meant that during that four-year period, the county customers of Regence and Blue Cross did not switch allegiances often, tending to stay with one carrier for a long period of time. *Id.*

**Memorandum Decision – Page 4**

Dr. Langenfeld first discussed his high incumbency theory in a "Supplemental Affidavit" he filed on May 31, 2005, a date that was 3 months after the deadline for the filing of plaintiff's Rule 26 reports, a month after his deposition, and on the last day of expert discovery.  This filing is not necessarily untimely, however, if it was a legitimate supplementation under Rule 26(e), which can occur at any time.

A legitimate supplementation under Rule 26(e) "means correcting inaccuracies, or filing the interstices of an incomplete report based on information that was not available at the time of the initial disclosure."  *Snake River Valley Electric Assoc. v. Pacificorp,* Civil No. 96-308-E-BLW (Memorandum Decision filed April 8, 2002) (quoting *Keener v. United States*, 181 F.R.D. 639, 640 (D.Mont. 1998)).  There is not a true supplementation when there is a "dramatic, pointed variation" between the supplementation and the original, and the information relied on in the supplementation was available at the time of the original report.  *Id., see also, Schweizer v. Dekalb Swine Breeders, Inc*. 954 F.Supp. 1495 (D. Kansas 1997) (excluding supplemental report of expert containing new opinions when there was no reason the opinions could not have been expressed in the expert's original report).

Dr. Langenfeld's "high incumbency" opinion was a "dramatic, pointed

**Memorandum Decision – Page 5**

variation" from his original report.  It would therefore not be a proper supplementation under the standard set forth above.  There is, however, another factor at play here that changes this analysis.  His opinion did not come out of the blue – it was a response to the expert report of Dr. Lawrence Wu filed by Regence on May 16, 2005.  Dr. Wu observed that counties did switch carriers often, and concluded that this was evidence that Regence and Blue Cross "continued to compete vigorously for contracts with employers."  *See Wu Report* at p. 22, ¶ 54.

Two weeks after receiving Dr. Wu's Report, Dr. Langenfeld filed his affidavit containing his high incumbency opinion.  Dr. Langenfeld countered Dr. Wu by concluding that the switching was less than what would be expected in a vigorously competitive market.  *See Transcript Filed February 21, 2006* at p. 16.  Thus, he is not attempting to sneak in a new opinion under cover of Rule 26(e)'s supplementation provisions, as was done in *Snake River*.  Instead, Dr. Langenfeld promptly responded to his opponent's opinions, thereby falling within the parameters of Rule 26(e).  The Court will therefore deny the motion to strike his opinions as untimely.[1]

### 3.   Motion to Exclude Testimony of William T. O'Brien

---

[1]  Defendants raised objections to the merits and methodology of Dr. Langenfeld's high incumbency opinion.  For reasons expressed later in this decision, the Court finds it unnecessary to resolve those objections at this time.

**Memorandum Decision – Page 6**

William T. O'Brien is an insurance actuary who has testified that he found premiums charged by Regence and Blue Cross to certain counties to be 5% to 10% "higher than I would expect in a market where premiums are set based upon competitive pressures." *See O'Brien Affidavit* at ¶ 6, p. 2.  For another set of counties, the rates were 15% to 20% higher "than I would expect in a market where premiums are set based upon competitive pressures." *Id*. at ¶ 7, p. 3.  Gemplan uses O'Brien's testimony to argue that Regence and Blue Cross are charging supracompetitive premiums.

O'Brien used "standard actuarial methodologies" to develop premium rates "that an insurance carrier would likely produce and quote to county governments in Idaho for groups with demographic and benefit characteristics similar to those of existing Idaho county employers." *Id*. at ¶ 4, p. 2.  He then compared these expected rates with rates actually charged by Regence and Blue Cross to Idaho counties, and calculated the percentage differences as set forth above.

O'Brien has a bachelors degree in mathematics, and is a health insurance actuary with long experience in the insurance underwriting business.  He testified that "health insurance actuaries primarily set premium rates for insurance companies." *See Transcript Filed February 21, 2006*, at p. 51.

He is clearly an expert on the setting of insurance premiums.  His testimony

**Memorandum Decision – Page 7**

about what premiums a hypothetical insurer "would likely" quote to Idaho counties – and how they compare to the actual premiums charged by Regence and Blue Cross – is well-within his expertise.  Thus, he can testify that actual premiums are, say, 15% higher than he would have expected.

This testimony describes a condition – higher than expected premiums – that he is qualified to render.  But he goes further.  He also offers an opinion on the cause of the condition – that it is due to a lack of competition.  Here he stretches beyond his area of expertise.

O'Brien is not an economist, and has no training or experience in the field of economics.  Gemplan recognizes this and asserts that he "will offer no opinions from the field of economics."  *Id*. at p. 7.[2]

Yet he has – he testifies that rates are supracompetitive.  This is typically the province of an economist, because such testimony must include answers to the following questions:  (1) What is his definition of a competitive market? (2) What model did he use to determine the cause of the higher-than-expected rates?  (3) Is his model reliable? (4) Can it be tested? (5) Is the model recognized by other experts for determining the cause of higher-than-expected rates?  *See, e.g.,*

---

[2]  In his testimony, O'Brien stated that he was not an expert economist nor an expert in econometric modeling.  *See Transcript Filed February 21, 2006*, at p. 54.

**Memorandum Decision – Page 8**

*In re Aluminum Phosphide Antitrust Litigation*, 893 F.Supp. 1497 (D.Kan. 1995)(discussing in detail the importance of economic models in estimating what rates would be in a competitive market free of the alleged price-fixing conspiracy).

O'Brien did use models – he used them to "develop the requested premium rates." *See O'Brien Report* at p. 4.  From his testimony, those models appear to be widely used in the industry as a reliable method of setting rates.  However, there is no indication in the record that the models are used to determine the cause of higher-than-expected rates observed in a specific market.  While experts often expand on the narrow data of models to offer broader opinions, O'Brien lacks the qualifications to do that here.

O'Brien does have the expertise (1) to determine whether Regence and Blue Cross are following their own underwriting policies in setting rates for Idaho counties; (2) to determine the expected rates for Idaho counties; and (3) to compare the expected rates with the actual rates to show how actual rates exceed expected rates.  However, he is not qualified to testify that the rates are supracompetitive.

Even if qualified, he has failed to answer the five questions listed above, and therefore his testimony is unreliable.  Moreover, his testimony fails to include crucial evidence.

O'Brien based his opinions on his study of 13 Idaho counties served by

either Regence or Blue Cross.  Of those 13 counties, 12 are experience-rated; that is, their rates are set in part based on their past claims experience.[3]  This experience rating is crucial, as O'Brien testified that "[e]xperience is the most important piece out there in determining where your rates should be set."  *See O'Brien Deposition* at p 72.  This is consistent with the testimony of another Gemplan underwriting expert, Mark Meade.  When asked in his deposition whether Regence's rates were supracompetitive, Meade answered that "[w]ithout seeing the actual claims experience, I did not have that knowledge."  *See Meade Deposition* at pp. 55-56.

Nevertheless, O'Brien did not take the actual claims experience into account in his analysis.  *See O'Brien Affidavit* at ¶ 9, p. 3.  In his affidavit filed March 10, 2005, O'Brien explained that he could not use the actual claims experience because Regence and Blue Cross had not provided him with that data.  *Id*.

Later Regence and Blue Cross did provide data.  In Gemplan's brief filed July 18, 2005, their counsel stated that "[b]oth Blue Cross and Regence have provided plaintiffs with additional discovery material since the date of O'Brien's report and O'Brien is currently analyzing that recently produced information to determine whether his report and deposition testimony should be supplemented

---

[3]  Smaller counties may not be experience rated, and thus claims experience may not be relevant to one of the counties examined by O'Brien.

**Memorandum Decision – Page 10**

pursuant to [Rule] 26(e)(1)." *See Gemplan Brief* at p. 14.  More than 8 months has

passed since that statement was made, but O'Brien has not filed any

supplementation with the Court.

During his testimony, O'Brien was asked if he had the information he

needed, and he answered, "some has, but there are still missing pieces." *See

Transcript filed February 21, 2006*, at p. 59.  Yet Gemplan has never filed a

motion to compel to obtain this information.  Apparently, O'Brien, according to his

testimony, simply abandoned his original analysis attempting to determine if

Regence and Blue Cross were following their own "underwriting and actuarial

methodologies," and moved on to consider what a hypothetical third-party insurer

would charge upon entering this market.  *Id*. at pp. 60-61.

To determine what rates would be in a competitive market, O'Brien would

need to use the claims experience for 12 of the 13 counties.  According to his own

testimony, and common sense, the claims experience is crucial for setting rates.

His failure to take claims experience into account means his testimony is

unreliable.  *See Concord Boat Corporation v. Brunswick Corporation*, 207 F.3d

1039, 1056-57 (8th Cir. 2000) (rejecting testimony of Dr. Robert Hall, a professor

of economics at Stanford, because his model for determining conditions in a

competitive market failed to "incorporate all aspects of the economic reality of the

**Memorandum Decision – Page 11**

. . . market . . . .").

For all of these reasons, the Court will grant the motion to exclude any testimony from William T. O'Brien that Regence and Blue Cross charged supracompetitive rates.[4]  The Court would also note that Dr. Langenfeld testified in his deposition that he agreed with the analysis of O'Brien, but he had not done his own analysis.  *See Dr. Langenfeld Deposition* at pp. 45-49.  When asked about his opinion on supracompetitive pricing, Dr. Langenfeld testified that "I haven't done that . . . and I've not been asked to do it; some other people have been.  So I'm not going to duplicate their work unless I'm asked to."  *Id*. at 49.

Thus, there is no competent evidence in the record that Regence or Blue Cross charged supracompetitive prices.

## 4.  <u>Motions for Summary Judgment</u>

Regence and Blue Cross seek summary judgment on the ground that the price-fixing claims are precluded by the McCarran-Ferguson Act.  That Act provides a limited exemption from the federal antitrust laws for the "business of insurance."  15 U.S.C. § 1013(b).  The Act contains three requirements: (1) the challenged conduct must constitute the "business of insurance," (2) the business of

---

[4]  It is unclear whether O'Brien is a replacement expert for Mark Meade, an actuary whose expert testimony was essentially similar to that of O'Brien.  If Gemplan is still proffering Meade as an expert, his testimony is subject to exclusion for the same reasons as O'Brien's.

**Memorandum Decision – Page 12**

insurance must be regulated by the state, and (3) the challenged conduct must not constitute a boycott or an act of coercion or intimidation.  *Id.*

Gemplan has stipulated that the assigned claims are price-fixing claims, based on allegations that Regence and Blue Cross fixed the rates charged to Idaho counties.  "It is clear from the legislative history [of the Act] that the fixing of rates is the 'business of insurance.'"  *See Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 224 at n. 32 (1979).  The *Group Life* decision reviewed the legislative history of the Act and concluded that Congress intended that "cooperative rate-making efforts [ by insurers] be exempt from the antitrust laws." *Id.* at 221.

These comments would appear to place price-fixing claims solidly within the definition of the "business of insurance" even without relying on a three-part test enunciated in *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119 (1982) that is employed to resolve more difficult questions of what claims fall within that term. However, even under that test, the result is the same.

Under the first prong of that test, the challenged conduct must have the effect of transferring or spreading a policyholder's risk.  It is well-established that the setting of premium rates has the effect of spreading and transferring a policyholder's risk.  *See Slagle v. ITT Hartford*, 102 F.3d 494, 498 (11th Cir. 1996)

**Memorandum Decision – Page 13**

(holding that price-fixing claim involved spreading policy-holder's risk under *Union Labor* test).

Second, the test requires that the practice be an integral part of the policy relationship between the insured and the insurer.  That is certainly satisfied here where the challenged conduct is the fixing of premium rates.

Finally, the practice must be limited to entities within the insurance industry. That requirement is also satisfied here, and thus the Court finds as a matter of law that Gemplan's price-fixing claims challenge conduct that is part of the "business of insurance."

The Act's second requirement is that the challenged conduct – the fixing of rates charged to counties by Regence and Blue Cross – be regulated by the State of Idaho.  Here, Gemplan does not dispute Regence's claim that Idaho's Insurance Code regulates the fixing of premium rates.

Gemplan's objection to the Act's application centers on the third requirement – that the price-fixing claims not constitute a boycott or an act of coercion or intimidation.  Gemplan asserts that its price-fixing claims do constitute a claim of boycott: "One insurance company helping a second competing insurance company by refusing to deal with the second company's customers [is] . . . a 'group boycott' . . . ."  *See Gemplan's Brief* at p. 15.

**Memorandum Decision – Page 14**

An agreement not to compete in certain territories or for certain customers does not necessarily constitute a boycott for purposes of the Act.  In *Hartford Fire Insurance v. California*, 509 U.S. 764 (1993), the Court held that parties conduct a boycott when they try to coerce a target into accepting certain terms on one transaction by refusing to engage in other, unrelated or collateral transactions with the target.  *Id.* at 802-03.

To illustrate its definition, *Hartford* offered as an example tenants who objected to a rent increase.  Their collective refusal to renew their leases until the landlord reduced rents would not be a boycott.  *Id.* at 802.  However, if the tenants go further and convince store keepers to refuse to sell food to the landlord until he reduces rents, the tenants are now engaged in a boycott.  *Id.*  "It is this expansion of the refusal to deal *beyond the targeted transaction* that gives great coercive force to a commercial boycott: unrelated transactions are used as leverage to achieve the terms desired."  *Id.* (emphasis added).

*Hartford* observed that the one prior Supreme Court case that found a boycott involved an insurer that enlisted others to coerce the insurer's customers into agreeing with the insurer's terms.  *St Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531 (1978).  This was a scheme akin to *Hartford's* example of tenants enlisting the aid of store keepers to coerce their landlord to reduce rents.

**Memorandum Decision – Page 15**

*Hartford's* definition was applied to a customer allocation claim in *Slagle v. ITT Hartford*, 102 F.3d 494 (11th Cir. 1996).  There, plaintiff Slagle claimed that windstorm insurers were engaged in a boycott because they had an agreement that precluded most from offering her a policy, leaving her with only one high-priced insurance option.  This claim is essentially the same as that made by Gemplan – that a group of insurers had an agreement not to compete for each other's customers.

*Slagle* held that "such alleged conduct does not constitute a boycott because the conditions of their [the insurers] refusal to deal relate directly to the terms of the purchase of windstorm insurance, the primary transaction, and not to some collateral transaction."  *Id*. at 499.  Similarly, in *State of Maryland v. Blue Cross*, 620 F.Supp. 907, 921-22 (D. Md. 1985), plaintiffs claimed that Blue Cross and Blue Shield were engaged in a boycott by refusing to compete for each other's customers and allocating markets in Maryland.  The court held that such an agreement did not constitute a boycott under the Act.  *Id.*

Under *Hartford, Slagle,* and *Maryland*, an agreement to allocate customers is not a boycott but may become one if third parties are enlisted to coerce the customers into compliance.  Here there is no evidence of such coercion.  At most, if Gemplan's allegations are true, Regence and Blue Cross agreed not to compete

for each other's customers, and that does not constitute a boycott.  While Gemplan tries to characterize its claim as a boycott, the label does not fit the evidence.  The reasoning of *Slagle* and *Maryland* is persuasive*,* and the Court therefore finds that the boycott exception is inapplicable here*.*

As an independent ground for this ruling, the Court finds that Gemplan's claim of boycott fails for lack of proof.  Gemplan has not presented any evidence that Regence and Blue Cross are refusing to write policies for each other's customers.

Instead, Gemplan offers the testimony of Dr. Langenfeld that high incumbency rates were "consistent with less vigorous competition," *see Dr. Langenfeld Rebuttal Report* at p. 26; *see also Transcript filed February 21, 2006* at p. 19 (at the hearing, Dr. Langenfeld testified that switching went up "dramatically" when Gemplan came into the market, "consistent with there being less aggressive competition prior to the entry of Gemplan when there were only two firms that dominated the market.")

Gemplan cites no authority that a boycott can be established merely by evidence of "less vigorous competition."  A boycott must involve some form of a refusal to deal, according to *Hartford's* definition.  *See*, *Hartford*, 509 U.S. at 801. Dr. Langenfeld's own data shows that about 30% of the counties switched carriers

**Memorandum Decision – Page 17**

during the years between 1999 and 2003.  *See Exhibit 5 to Langenfeld Rebuttal Report*.  Even if that is not vigorous competition, it does not constitute a refusal to deal.

Moreover, Dr. Langenfeld did not examine any data on how often counties request bids, and what response they receive from Regence and Blue Cross.  If counties were not seeking to switch, high incumbency is better explained by customer satisfaction or inertia than a boycott.  Without knowing these crucial facts about what was going on in the marketplace, it is mere speculation to conclude that the lack of switching was due to a boycott.

High incumbency rates simply describe a condition (counties rarely switch carriers), not its cause (whether due to a boycott, a desire to stay put, or some other reason).  Yet the cause is the key, not the condition.  The Court, or a reasonable juror, is left entirely to speculate whether the high incumbency rate is caused by a boycott or a desire to stay put.[5]  Evidence that depends so heavily on speculation for its relevance does not raise a "genuine issue of material fact" under Rule 56.

---

[5]  A lack of switching could be caused by many other factors than a boycott:  "A consumer may ignore a price increase occasioned by a collusive arrangement because the consumer is acting on instinct rather than on cold calculation.  Second, for emotional or practical reasons, it may not be worth the bother for the consumer to seek out new sources of supply."  Harry Gerla, *A Micro-Microeconomic Approach to Antitrust Law,* 86 Mich. L. Rev. 892, 923 (April 1988).  The condition (lack of switching) says nothing about whether its cause is a boycott or some other factor.  Certainly there are cases where a condition reveals something about the cause.  For example, a knife in the back raises a question of murder.  Here, that does not apply.

**Memorandum Decision – Page 18**

Gemplan argues, however, that an additional piece of evidence fills in this gap – specifically, the evidence that Gemplan immediately took away many customers from Regence and Blue Cross upon entering the market.  Gemplan argues that it is reasonable to infer from this that Regence and Blue Cross must not have been vigorously competing for customers before Gemplan's entry.

As the Court discussed above, a lack of vigorous competition does not signal a boycott.  Moreover, it is pure speculation to say that Gemplan's success is due to a lack of prior competition, especially in light of the lack of evidence of supracompetitive prices.  Perhaps Gemplan just had a better product or more alluring marketing.  On this record, a reasonable juror would be left to guess.

Gemplan asserts that it has presented evidence of a boycott in the form of an exchange of e-mails between Don Sherwood of Blue Cross and Elaine Daly-Kerr, the underwriter who evaluated a request for a quote from Jefferson County.  The e-mails are dated July 29, 2004.

In the e-mail exchange, Daly-Kerr begins by concluding that Blue Cross should not provide a quote because "there were several major health conditions and the group did not look like a good risk to add to the county pool."  She then asks "what rate increase did the group [Jefferson County] get this year?"

Sherwood responds that "they were going to get 20 to 25% increase."  He

**Memorandum Decision – Page 19**

then goes on to note that "[t]hey probably are not going to commit until they know what the competition is going to do?  I will let the broker know so that they will get the maximum.  I doubt they will move to the Gemplan, the broker said there is no trust with them."

Gemplan asserts that this shows "bid-rigging" – that Blue Cross intended to assist Regence "by informing Blueshield [Regence] that it would not be providing one of Blueshield's [Regence's] county customers with a bid."  *See Gemplan's Response Brief re McCarran-Ferguson,* at p. 15.  However, the e-mails do no such thing.  They were not directed to Regence, and there is no evidence that Regence ever knew in advance that Blue Cross would not be bidding.  Moreover, the e-mails are dated after Regence's bid, so they cannot be evidence that Regence and Blue Cross were agreeing to boycott each other's customers.

Gemplan responds that Sherwood's response shows that he intended to help Regence get the "maximum" from its bid, and this is evidence that the two insurers were acting in concert to boycott each other's customers.  This makes no sense, however.  The evidence is clear that Blue Cross declined to bid because of unacceptable health risks.  While Blue Cross's decision not to bid may have incidentally benefitted Regence, this does not even raise an inference of boycott where Blue Cross was clearly acting independently in its self-interest.  Thus, the

**Memorandum Decision – Page 20**

exchange of e-mails dated July 29, raises no genuine issue of material fact concerning boycott or collusion.

For all these reasons, the Court finds that Gemplan has not raised any genuine issues of material fact that Regence and Blue Cross were engaged in a boycott as that term is used in the McCarran-Ferguson Act.  Because all the requirements of that Act have been satisfied, as discussed above, the Court finds that Regence and Blue Cross are entitled to the Act's exemption, and thus Gemplan's price-fixing charges must be dismissed.

## 5.   <u>MIA's Claim</u>

The only remaining claims in this case involve MIA's claims that it was improperly terminated by Regence and Blue Shield.  In its earlier decision, as discussed above, the Court held that these claims were subject to dismissal. However, because the Court was allowing Gemplan to amend the complaint to add price-fixing claims, the Court refrained from dismissing MIA's claims in order to give MIA time to develop the price-fixing claims.  The Court reasoned that if Regence and Blue Cross were fixing prices before Gemplan's entry into the market, that would be some evidence indicating that perhaps they acted together to terminate MIA in an effort to drive Gemplan out of the market.

The Court has now dismissed the price-fixing claims under the McCarran-

Ferguson act. That does not automatically result in a dismissal of MIA's claims. Because the dismissal of the price-fixing claims was not on the merits, there may be sufficient evidence to raise questions of fact over whether Regence and Blue Cross conspired to fix prices, which would bear on whether they conspired to later terminate MIA.

MIA alleges that it has at least raised questions of fact that Regence and Blue Cross did collude, and points to the following evidence in support of this argument: (1) O'Brien's testimony that rates were supracompetitive, (2) Dr. Langenfeld's testimony about high incumbency rates, (3) e-mails showing collusion between Regence and Blue Cross, (4) the concerted refusal of Regence and Blue Cross to release information, and (5) the fact that both insurers terminated MIA so close in time to each other after having known for years that MIA officials were making disparaging comments about them to others. *See Transcript filed February 21, 2006*, at pp. 117-118; *see also, Dr. Langenfeld's Supplemental Affidavit* at ¶ 6, p. 3.

Taking the last point first, it raises no genuine issue of material fact. In the Court's earlier decision, it reviewed at length the increasingly critical comments made by MIA officials against Regence and Blue Cross as they brought Gemplan into the market to compete with those two insurers. Even if MIA had been critical

of Regence and Blue Cross years earlier, this more recent disparagement had special significance because it was conducted to help a competitor – Gemplan – take customers from Regence and Blue Cross.

Given these facts, it was entirely within the individual self-interest of each insurer to take quick action against MIA.  The close-in-time terminations are completely explained by self-interested actions on the part of the insurers, and no inference of collusion can be made simply by the timing of the terminations.

MIA also argues that various e-mails raise questions about collusion.  The Court has already rejected that argument as to the July 29, 2004, e-mails.  MIA uses those e-mails in a slightly different context, however, to make an additional argument.  MIA points out that two years earlier, in an internal July 19, 2002, e-mail, Sherwood expressed a desire to "kill the Gemplan" by "lock[ing] in a renewal with Bonneville County" so that Gemplan would be stymied in meeting their membership goals.  MIA argues that this pitched competition with Gemplan "is in stark contrast to the way Mr. Sherwood treated Regence, his main competitor, over the Jefferson County account, two years later, when he passed on information that [Blue Cross] was not going to bid in order to help Regence get its maximum increase."  *See Plaintiffs' Response Brief* at p. 38.

However, as the Court noted above, there is no evidence that Blue Cross

gave Regence advance notification that it would not be bidding.  In fact, Blue Cross decided not to bid on the Jefferson County account due to unacceptable health risks.  There is no evidence that Blue Cross declined to bid out of some desire to help Regence.  This argument is likewise without merit.

MIA points to another e-mail dated August 21, 2001, between Blue Cross officials Sherwood, Richard Armstrong, and Rex Warwick.  In the e-mail, Sherwood tells Armstrong and Warwick that Bonneville County has offered to forego signing with Regence if Blue Cross can agree to limit its rate increase to 10%.  Sherwood requests that Armstrong and Warwick discuss this with underwriting and give him some direction.  He closes the e-mail by stating "I sure don't want Regence to see this experience report, who knows how the [sic] will react to it given their recent unpredictability."

MIA argues that the term "recent unpredictability" must mean Regence's "recent willingness to compete for county business."  *See MIA Response Brief* at p. 39.  MIA goes on to argue that "[s]uch an expression of surprise that the competition may actually try to compete supports an inference that in the view of Sherwood and others at [Blue Cross], Regence is not *supposed* to compete."  *Id.* (emphasis in original).

MIA reads much more into the e-mail than is actually there.  The e-mail

simply shows the reluctance of one insurer to share information with another. This argument likewise has no merit.

MIA continues to argue that the insurers act in concert to refuse to release claims information, and that this is further evidence of collusion. The Court rejected this argument in its earlier decision, and will not repeat that discussion here. At most, this is evidence of parallel conduct, and is entirely within their self-interest. By refusing to release claims data on smaller counties – counties that are part of a community-rated group or pool – the insurers prevent competitors from obtaining a marketing advantage by identifying small groups that have low risks. Such self-interested conduct cannot be a "plus factor" permitting an inference of conspiracy.

MIA argues next that the high prices and incumbency rates combine to create an inference of collusion. In examining this evidence, the Court notes first that it has struck testimony that the rates are supracompetitive. The Court is left with O'Brien's testimony that actual rates charged by Regence and Blue Cross are higher than his models predicted.

However, as discussed above, O'Brien failed to feed actual conditions in the market, such as claims experience, into his models. Due to the highly individualized nature of each market, there may be legitimate reasons why actual

**Memorandum Decision – Page 25**

rates are high.  Perhaps the past claims experience has been adverse or the population is elderly (bad demographics).  The role of plaintiffs' expert is to at least raise questions of fact by showing that these market conditions either do not exist or did not contribute to the price levels.  In other words, the expert strips away legitimate reasons for high prices, leaving the inference that they were caused by collusion.

This is what Dr. Langenfeld meant when he testified, after being asked to comment on O'Brien's conclusions, that  "[i]f it turns out that they controlled for everything else, and the extra amount [higher prices] can't be explained by demographics, et cetera, et cetera, the other things you'd want to take into account, then typically you infer that [the higher prices are] the result of the exercises of market power."  *See Dr. Langenfeld Deposition* at p. 46.

It turns out that O'Brien failed to control for actual claims experience – the most crucial factor in setting rates, as discussed above – and actual demographics. Because his models did not take into account these actual market conditions, the reason for the difference between the actual rates and the predicted rates is not apparent.  O'Brien himself testified that even those counties paying 15% to 20% more than his predicted rates could be getting "a good deal . . . based on the [actual] age/gender mix and the [claims] experience."  *See O'Brien Deposition* at p.

**Memorandum Decision – Page 26**

66.

There is therefore no competent evidence that the actual rates charged by Regence and Blue Cross were at a level that would allow an inference of collusion. Given that, the high incumbency rates mean little. The Court has fully discussed the relevancy of high incumbency rates above, and found that they do not warrant an inference of collusion on this record.

The Court has disposed of many of MIA's arguments in its prior decision and reaffirms those holdings here. The Court cannot find any competent evidence in the record that would raise a genuine issue of material fact that Regence and Blue Cross were engaged in concerted activity to terminate MIA and thereby destroy Gemplan. Thus, there is no longer any reason to refrain from dismissing all claims in this case. The Court will therefore grant defendants' motions, and

will do so in a separate judgment as required by Rule 58.



DATED:  **March 31, 2006**

B. LYNN WINMILL
Chief Judge
United States District Court